1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ISAAC SCOTT CASTANEDA,                    Case No.  1:20-cv-00377-JLT-HBK (HC)

12              Petitioner,                    FINDINGS AND RECOMMENDATIONS TO
                                               GRANT RESPONDENT'S MOTION TO
13        v.                                   DISMISS PETITION AS UNTIMELY[1]

14   THERESA CISNEROS,                         FOURTEEN-DAY OBJECTION PERIOD

15              Respondent.                    (Doc. No. 24)

16

17

18        Petitioner Isaac Scott Castaneda ("Petitioner" or "Castaneda"), a state prisoner, initiated

19   this action by filing a pro se petition for writ of habeas corpus under 28 U.S.C. § 2254.  (Doc. No.

20   1, "Petition").  In response, Respondent filed a Motion to Dismiss.  (Doc. No. 24).  Petitioner

21   filed an opposition to the Motion to Dismiss and supplemental briefing after being directed by the

22   Court.  (Doc. Nos. 18, 27, 29).  Petitioner did not file a response to Respondent's Motion to

23   Dismiss or the supplemental briefing, and the time for doing so has expired.  For the reasons set

24   forth more fully below, the undersigned recommends granting Respondent's Motion to Dismiss.

25                                  **I. BACKGROUND**

26        Petitioner is serving a state prison sentence for his conviction of, *inter alia*, attempted

27   ─────────────────

28   [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
     (E.D. Cal. 2022).

1   murder and possession of a firearm by a felon entered by the Kings County Superior Court on

2   February 13, 2014.[2]  (Doc. No. 1 at 1).  Petitioner's sentence was enhanced by findings of gang

3   membership and gun possession.  (*Id*.).  Petitioner was sentenced to forty-five years to life for the

4   attempted murder conviction, twenty-five years to life on the sentencing enhancements, and a

5   stayed six-year term on the possession of a firearm conviction.  (Doc. No. 24 at 1-2).

6        Petitioner appealed the conviction to the California Court of Appeal, Fifth Appellate

7   District, which was affirmed on February 4, 2016.  (Doc. No. 26-1).  The California Supreme

8   Court denied review on April 20, 2016.  (Doc. No. 26-3).  Petitioner then filed six post-conviction

9   collateral challenges in the state courts, all petitions for writ of habeas corpus, as follows:[3]

10       1.  Kings County Superior Court

11       Filed: February 13, 2017

12       Denied: April 3, 2017

13       2.  California Court of Appeal, Fifth Appellate District

14       Filed: April 25, 2017

15       Denied: June 9, 2017

16       3.  Kings County Superior Court

17       Filed: October 26, 2017

18       Denied: December 12, 2017

19       4.  California Court of Appeal, Fifth Appellate District

20       Filed: February 21, 2018

21       Denied: April 27, 2018

22       5.  California Supreme Court

23       Filed: December 12, 2018

24

25   [2] Although Petitioner did not provide his date of conviction in his petition, the Court takes judicial notice
     of Petitioner's date of conviction on the Kings County Superior Court online case database under Federal
26   Rule of Evidence 201.  *See* https://cakingsportal.tylerhost.net/CAKINGSPROD/Home/Dashboard/29, last
     accessed August 15, 2022.
27   [3] Unless otherwise indicated, pursuant to the mailbox rule, the Court deems the various petitions filed on
     the dates they were signed and presumably handed to the prison authorities for mailing.  *Houston v. Lack*,
28   487 U.S. 266, 276 (1988); *Campbell v. Henry*, 614 F.3d 1056, 1059 (9th Cir. 2010).

1  Denied: May 1, 2019

2    6.  California Supreme Court

3  Filed: March 15, 2020[4]

4  Denied: July 22, 2020

5  (Doc. Nos. 26-4 – 26-15).  On March 2, 2020, Petitioner filed the instant Petition.  Petitioner

6  makes the following claims for relief: (1) newly discovered evidence proves he is innocent of his

7  crimes of conviction; (2) the state court erred when it declined to hold a hearing on the newly

8  discovered evidence; and (3) prosecutorial and trial court errors violated his constitutional rights.

9  (Doc. No. 1 at 4-9).

10    Respondent contends the Petition should be dismissed because it is untimely and the

11  actual innocence exception to the statute of limitations should not apply.  (*See generally* Doc.

12  Nos. 24, 29).  Petitioner did not file any response to the Motion to Dismiss or the supplemental

13  briefing.  However, in his earlier briefing Petitioner argues that he should be entitled to gap

14  tolling for the periods during which he was seeking state habeas review; equitable tolling due to

15  the ineffectiveness of his trial and appellate counsel; and, in the alternative, equitable tolling of

16  the statute of limitations under the actual innocence gateway described in *Schlup v. Delo*, 513

17  U.S. 298 (1995) and *McQuiggin v. Perkins*, 569 U.S. 383 (2013).  (*See* Doc. Nos. 10, 19).

18  **II.  APPLICABLE LAW AND ANALYSIS**

19    Under Rule 4, if a petition is not dismissed at screening, the judge "must order the

20  respondent to file an answer, motion, or other response" to the petition.  R. Governing 2254 Cases

21  4.  The Advisory Committee Notes to Rule 4 state that "the judge may want to authorize the

22  respondent to make a motion to dismiss based upon information furnished by respondent."  A

23  motion to dismiss a petition for writ of habeas corpus is construed as a request for the court to

24  dismiss under Rule 4 of the Rules Governing Section 2254 Cases.  *O'Bremski v. Maass*, 915 F.2d

25

26  [4] Respondent points out Petitioner signed the sixth state petition on March 15, 2020, which is also the date on the proof of service.  (*See* Doc. No. 26-14).  However, the file-stamp date on the state petition is May 8, 2020.  (*Id*. at 1).  "Although it is not probable that the sixth state petition took two months to process,

27  Respondent, without conceding the issue and while recognizing the possibility that COVID-19 may have impacted institutional procedures, has listed the filing date of the sixth state petition as March 15, 2020,

28  the earlier of the two dates." (Doc. No. 24 at 3 n.4).

418, 420 (9th Cir. 1990).  Under Rule 4, a district court must dismiss a habeas petition if it "plainly appears" that the petitioner is not entitled to relief.  *See Valdez v. Montgomery*, 918 F.3d 687, 693 (9th Cir. 2019); *Boyd v. Thompson*, 147 F.3d 1124, 1127 (9th Cir. 1998).

**A. Petition Not Timely Filed Under AEDPA's Statute of Limitations**

Title 28 U.S.C. § 2244, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, sets a one-year period of limitations to the filing of a habeas petition by a person in state custody.  This limitation period runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  For most habeas petitioners, the one-year clock starts to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  42 U.S.C. § 2244(d)(1)(A).  In this case, the California Supreme Court denied review on April 20, 2016.  Thus, direct review concluded on July 19, 2016, when the ninety (90) day period for seeking review in the United States Supreme Court expired.  *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983); U.S. Sup. Ct. R. 13.  For the purposes of § 2244(d)(1)(A), AEDPA's one-year statute of limitations began running the next day on July 20, 2016.  (Doc. No. 24 at 3).  Petitioner had until July 19, 2017 to file his federal habeas petition, absent statutory or equitable tolling.  *See Patterson v. Stewart*, 251 F.3d 1243, 1246-47 (9th Cir. 2001) (adopting anniversary method to calculate one-year statutory period).  Petitioner filed his federal petition on March 2, 2020.  (Doc. No. 1).  Thus, absent any applicable tolling, the instant petition is barred by the statute of limitations.

4

1

**1. Commencement of Limitations Period**

2      Under § 2244(d)(1)(D), the limitations period shall run from "the date on which the

3 factual predicate of the claim or claims presented could have been discovered through the

4 exercise of due diligence."  However,

> 5      Section 2244(d)(1)(D) provides a petitioner with a later accrual date
> 6 than section 2244(d)(1)(A) only 'if vital facts could not have been
> known' " by the date the appellate process ended.  *Schlueter,* 384
> F.3d at 74 (*quoting Owens v. Boyd,* 235 F.3d 356, 359 (7th
> 7 Cir.2000)). The "due diligence" clock starts ticking when a person
> knows or through diligence could discover the vital facts, regardless
> 8 of when their legal significance is actually discovered.  *See Hasan,*
> 254 F.3d at 1154 n. 3; *see also Redd v. McGrath,* 343 F.3d 1077,
> 9 1082 (9th Cir.2003).

10 *Ford v. Gonzalez*, 683 F.3d 1230, 1235 (9th Cir. 2012) (internal citation and quotation marks

11 omitted).  In earlier briefing, Petitioner argued the affidavits submitted in support of his actual

12 innocence claim, discussed in detail below, were not "discovered until the AEDPA 1-year time

13 limit had already begun to run."  (Doc. No. 13).  Petitioner also argued in separate briefing that he

14 is entitled to an unidentified later "trigger date" under § 2244(d)(1)(D) because he continued to

15 exercise due diligence despite the alleged ineffectiveness of trial and appellate counsel.  (*See*

16 *generally* Doc. No. 19).

17      Petitioner's argument that he is entitled to a later commencement date of the limitations

18 period and vague and conclusory.  Furthermore, Petitioner fails to specifically identify a date the

19 statute of limitations period should run from pursuant to § 2244(d)(1)(D), *i.e.* the date when he

20 "discovered" the purported new evidence in the form of affidavits supporting his actual innocence

21 claim, or the date he "discovered" ineffectiveness of trial and appellate counsel.  Moreover, this

22 evidence was readily discoverable at any time during the trial or immediately thereafter.  As

23 discussed below with respect to the affidavits regarding the victim's alleged motivation to falsely

24 identify him as the shooter, Petitioner attempted during his trial to impeach the credibility of the

25 victim by making the same argument – that the victim named Petitioner as the shooter due to a

26 longstanding "grudge" against Petitioner for sleeping with the mother of his child.  And

27 Petitioner's own summary of his "due diligence" regarding his claims of ineffective assistance of

28 counsel acknowledges that he was aware of "vital facts" by the date the appellate process ended.

1   *See Ford*, 683 F.3d at 1235.

2   *Supra*, under § 2244(d)(1)(D), the statute of limitations runs from the time the facts were

3   known or could have been discovered, not from the time Petitioner discovered, or endeavored to

4   discover through due diligence, a possible legal significance.  Petitioner fails to show he

5   exercised the requisite due diligence to justify a delayed accrual date for his claims of actual

6   innocence and ineffectiveness of counsel.  Thus, Petitioner is not entitled to a later trigger of the

7   AEDPA statute of limitations pursuant to § 2244(d)(1)(D).  Moreover, even if the Court

8   recalculates the statute of limitations from the later accrual date of Petitioner's habeas petition

9   filed on October 26, 2017, wherein he asserts the actual innocence claim in a habeas petition to

10  the state superior court based on the 2017 "newly discovered" affidavits, the Petition would still

11  be untimely, as discussed in detail below.

12                              **2.  Statutory Tolling**

13          The federal statute of limitations tolls for the "time during which a properly filed

14  application for State post-conviction or other collateral review with respect to the pertinent

15  judgment or claim is pending."  28 U.S.C. § 2244(d)(2).  An application for post-conviction or

16  other collateral review is "pending" in state court "as long as the ordinary state collateral review

17  process is 'in continuance'—*i.e.*, 'until the completion of' that process.'"  *Carey v. Saffold*, 536

18  U.S. 214, 219 (2002) (citations omitted).  "California's collateral review system differs from that

19  of other States in that it does not require, technically speaking, appellate review of a lower court

20  determination."  *Id*. at 221.  Instead, petitioners are required to file an original habeas petition and

21  a subsequent appeal in each level of court (superior, appellate, and supreme) within a

22  "reasonable" period.  *Id.* at 221-22; *Robinson v. Lewis,* 9 Cal. 5th 883, 897 (2020) ("There are no

23  specific time limits for either filing the first [habeas] petition or filing subsequent petitions in a

24  higher court.  Instead, California courts employ a *reasonable*ness standard.  The claim must

25  generally be presented without substantial delay.").  A petition is considered no longer "pending,"

26  and the petitioner is barred from AEDPA statutory tolling, if an unreasonable amount of time

27  elapsed between the filing of state court habeas petitions.  *Saffold*, 536 U.S. at 221.

28          To determine whether a habeas claim was filed within a reasonable amount of time,

California courts consider three factors. *Robinson,* 9 Cal. 5th at 897.  First, "a claim must be presented without *substantial delay.*"  *Id*. (emphasis in original).  "'Substantial delay is measured from the time the petitioner or his or her counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim."'  *Id*. (quoting *In re Robbins*, 18 Cal. 4th 770, 780 (1998)).  Second, if a petition was filed with substantial delay, a petition may yet be considered on the merits if the "petitioner can demonstrate *good cause* for the delay."  *Id*. (emphasis in original).  Third, a petition filed without good cause for substantial delay will be considered if it falls under one of four narrow exceptions.  *Id*.  Only three of the four exceptions are relevant to noncapital cases: (1) the "'error of constitutional magnitude led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner;'" (2) "'the petitioner is actually innocent of the crime or crimes of which he or she was convicted;'" and (3) "'the petitioner was convicted or sentenced under an invalid statute.'"  *In re Reno*, 55 Cal. 4th 428, 460 (2012) (quoting *Robbins*, 18 Cal. 4th at 780).  The California Supreme Court has opined that a six-month gap delay would normally be "unduly generous," but adopted "a time period of 120 days as the safe harbor for gap delay" for the filing of habeas petitions between state court levels.  *Robinson*, 9 Cal. 5th at 901.  "A new petition filed in a higher court within 120 days of the lower court's denial will never be considered untimely due to gap delay."  *Id*.

For petitions filed in a "reasonable time," a petitioner may count as "pending" the "days between (1) the time the lower state court reached an adverse decision, and (2) the day he filed a petition in the higher state court."  *Evans v. Chaviz*, 546 U.S. 189, 193 (2006).  This Court "must itself examine the delay in each case and determine what the state courts would have held in respect to timeliness."  *Id.* at 198.

Here, AEDPA's statute of limitations began running on July 20, 2016, at the conclusion of direct review per § 2244(d)(1)(A), and continued to run until Petitioner filed his first state habeas petition on February 13, 2017.  (*See* Doc. No. 26-4).  "AEDPA's statute of limitations is not tolled from the time a final decision is issued on direct state appeal and the time the first state collateral challenge is filed because there is no case 'pending' during that interval."  *Nino v.*

*Galaza*, 183 F.3d 1003, 1006 (9th Cir. 1999).  Accordingly, 208 days elapsed on the AEDPA

clock between the conclusion of direct review and the filing of Petitioner's first state habeas

petition.  As noted by Respondent, the limitations period was then tolled from February 13, 2017,

the date Petitioner filed his first state habeas petition, through June 9, 2017, the date the state

appellate court denied Petitioner's habeas petition.  *Id.* at 1006-07 (The limitations period

"remains tolled during the intervals between the state court's disposition of a state habeas petition

and the filing of the petition at the next state appellate level."); *Delhomme v. Ramirez*, 340 F.3d

817, 821 n.3 (9th Cir. 2003) ("[T]he crucial issue for tolling purposes is whether the petitioner has

timely proceeded to the next appellate level, since the one year filing period is tolled to allow the

opportunity to complete one full round of review.").  Thus, the AEDPA clock commenced

running again on Monday, June 12, 2017.[5]

        As noted by Respondent, after the state appellate court denied Petitioner's state habeas

petition, Petitioner "proceeded downward" by filing a petition in state superior court, that raised a

different claim than those raised in the previous state petitions.  (Doc. No. 24 at 6).  Statutory

tolling is not available for intervals between separate rounds of state post-conviction proceedings.

*See Biggs v. Duncan*, 339 F.3d 1045, 1048 (9th Cir. 2003) (application for post-conviction relief

is pending during the "intervals between a *lower* court decision and a filing of a new petition in a

*higher* court"); *Welch v. Newland*, 350 F.3d 1079, 1083 (9th Cir. 2003) (a petitioner 'is not

entitled to statutory tolling during the period of inaction between his separate applications for

relief in the California state courts."); *Stockton v. Barnes*, 2014 WL 5325422, at *6 (E.D. Cal.

Oct. 17, 2014) ("Because petitioner did not proceed up the ladder to the next higher court, such

filing does not toll the limitations period.").  Therefore, the AEDPA clock continued to run for

another 136 days—from June 12, 2017 until the filing of Petitioner's filed his third state petition

on October 26, 2017.  Thus, including the 208 days that had elapsed before Petitioner filed his

first state habeas petition, a total of 344 days ran on the limitation period before Petitioner filed

his third state habeas petition.

---

[5] Because June 10, 2017 was a Saturday, the Court restarts AEDPA's clock on the next business day,
Monday, June 12, 2010.

8

AEDPA's limitations period was then tolled from October 26, 2017, the date Petitioner filed his third state habeas petition, through April 27, 2018, the date the state appellate court denied Petitioner's fourth habeas petition, because Petitioner proceeded in a diligent manner and filed his fourth habeas petition in the appellate court 71 days after the denial of his third petition in superior court. *See Nino*, 183 F.3d at 1006-07. However, Petitioner did not file his fifth state court petition until December 12, 2018, more than seven months after his fourth petition was denied on Friday, April 27, 2018. This delay is substantially longer than the 120-day "safe harbor" gap delay for the filing of habeas petitions between state court levels. *See Robinson*, 9 Cal. 5th at 901. Thus, because Petitioner failed to present his fifth petition to the California Supreme Court without substantial delay and offered no argument as to good cause for this delay, it was not presented within a reasonable amount of time and the AEDPA clock continued to run as of Monday, April 30, 2018 and continued to run for 21 days until it expired on May 21, 2018.[6] Petitioner did not file the Petition until March 2, 2020, exceeding the one year period of limitations by over twenty-one months.

In earlier briefing, Petitioner generally argues that he has "met the requirement for gap tolling" because "newly discovered evidence" was filed in the superior court within the "reasonable time limit." (Doc. No. 10 at 2). The discovery of new evidence can constitute good cause for the purposes of gap tolling if the petitioner could not have discovered the new evidence prior to the filing of the state habeas petition in the lower court. *See Rouse v. Perez*, 2017 WL 3174534, at *3 (S.D. Cal. July 26, 2017); *Davis v. Kibler*, 2022 WL 2121907, at *4 (C.D. Cal. Feb. 24, 2022). Petitioner argues he is entitled to gap tolling because the affidavits contained in this habeas petition could "have come no sooner" than June 2017. (Doc. No. 10 at 1). Specifically, "the alleged victim [] informed [the affiant] through casual conversation that he had perjured himself by stating the petitioner was the one who shot at him because the petitioner was now involved in a sexual relationship with the victim's child's mother." (*Id*.). This argument

---

[6] The fifth and sixth petitions, both filed in the California Supreme Court, on December 12, 2018 and March 15, 2020, respectively, had no tolling consequence because the limitations period would have already expired. *See Green v. White*, 223 F.3d 1001, 1003 (9th Cir. 2000) (Petitioner is not entitled to tolling where the limitations period has already elapsed).

1  lacks merit.  The contention that the victim falsely accused Petitioner of shooting him because he

2  held a "grudge" was made in an attempt to discredit the victim during the trial.  Thus, the

3  "discovery" of evidence does not constitute good cause to excuse substantial delays identified

4  above because Petitioner already knew the underlying facts of the "new evidence" before he filed

5  his first habeas petition with the superior court.  *See Rouse*, 2017 WL 3174534, at *3.

6      Moreover, even were the Court to find good cause for the delay in filing this additional

7  petition, which raised the claims based on "new evidence" identified by Petitioner for the first

8  time, the Petition would still be time barred.  As noted above, Petitioner's fourth petition was

9  denied by the appellate court on Friday, April 27, 2018 but Petitioner did not file his fifth state

10  court petition until 227[7] days later, on December 12, 2018.  Because Petitioner failed to present

11  his fifth petition to the California Supreme Court without substantial delay, and offered no

12  argument as to good cause for this particular delay, it was not presented within a reasonable

13  amount of time.  Consequently, even if the Court gave Petitioner the benefit of tolling for the

14  entire time between June 9, 2017 and Monday, April 30, 2018, when the AEDPA clock restarted,

15  the one-year AEDPA limitation period would have expired 157 days later on October 4, 2018.

16  Thus, even with the benefit of the "newly discovered evidence," the Petition filed on March 2,

17  2020, was untimely by 515 days (16 months and 27 days).

18      Therefore, the Petition must be dismissed as time barred unless Petitioner can demonstrate

19  that he is entitled to equitable tolling or he satisfies the narrow gateway of actual innocence under

20  *Schlup*.

21              **3.  Equitable Tolling**

22      AEDPA's statutory limitations period may be equitably tolled.  *Holland v. Florida*, 560

23  U.S. 631, 645 (2010).  Equitable tolling is available if a petitioner shows: "(1) that he has been

24  pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and

25  prevented timely filing."  *Id.* at 649.  To show "extraordinary circumstances," a petitioner must

26  show that "the circumstances that caused his delay are both extraordinary and beyond his

27

28  ───────────────────
[7] The Court credits Petitioner with two days due to April 27, 2018 falling on a Friday.

1  control"—a high threshold.  *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S.

2  250, 255 (2016).  "The requirement that extraordinary circumstances 'stood in [a petitioner's]

3  way' suggests that an *external* force must cause the untimeliness.  *Waldron-Ramsey v. Pacholke*,

4  556 F.3d 1008, 1011 (9th Cir. 2009) (emphasis added).  Furthermore, a petitioner must show that

5  the extraordinary circumstances *caused* the untimely filing of his habeas petition.  *See Bills v.*

6  *Clark*, 628 F.3d 1092, 1097 (9th Cir. 2010) (citing *Spitsyn v. Moore*, 345 F.3d 796, 799 (9th Cir.

7  2003) (explaining that equitable tolling is available only when the extraordinary circumstances

8  were the cause of the petitioner's untimeliness); *Smith v. Davis*, 953 F.3d 582, 595 (9th Cir. 2020)

9  ("Whether an impediment caused by extraordinary circumstances prevented timely filing is a

10  'causation question.'").

11         To demonstrate that he has been pursuing his rights diligently, a petitioner must show that

12  he has "been reasonably diligent in pursuing his rights not only while an impediment to filing

13  caused by an extraordinary circumstance existed, but before and after as well, up to the time of

14  filing his claim in federal court."  *Smith*, 953 F.3d at 598-99.  In other words, "when [a petitioner]

15  is free from the extraordinary circumstance, he must also be diligent in actively pursuing his

16  rights."  *Id.* at 599.  The diligence required for equitable tolling does not have to be maximum

17  feasible diligence, but rather reasonable diligence.  *Holland*, 560 U.S. at 653.  And the court is not

18  to impose a rigid impossibility standard on petitioners, especially *pro se* prisoner litigants "who

19  have already faced an unusual obstacle beyond their control during the AEDPA litigation period."

20  *Fue v. Biter*, 842 F.3d 650, 657 (9th Cir. 2016) (quoting *Sossa v. Diaz*, 729 F.3d 1225, 1236 (9th

21  Cir. 2013)).  However, "in every instance reasonable diligence seemingly requires the petitioner

22  to work on his petition with some regularity—as permitted by his circumstances—until he files it

23  in the district court."  *Smith*, 953 F.3d at 601.  Because Petitioner must show diligence before,

24  during, and after extraordinary circumstances prevented him from filing, the relevant time period

25  of the court's analysis is July 20, 2016, the day the statute of limitations began to run, to March 2,

26  2020, the day Petitioner signed and constructively filed his federal petition.  *See Smith*, 953 F.3d

27  at 598-99.  Admittedly, "the threshold necessary to trigger equitable tolling under AEDPA is very

28  high, lest the exceptions swallow the rule."  *Miranda v. Castro*, 292 F.3d 1062, 1066 (9th Cir.

1    2002) (citations omitted).

2          Petitioner argues equitable tolling applies because through "ongoing diligence" he

3    discovered "important facts" that both trial counsel and appellate counsel were "ineffective at trial

4    and on appeal."  (Doc. No. 19 at 11).  In support of this argument, Petitioner cites, and attaches as

5    exhibits, letters from his appellate counsel from July 2014 through May 2016, including

6    responses to Petitioner's requests for "pieces of evidence"; appellate counsel's response that she

7    did not request certain documents as part of the appeal "as the appeal is concerned with what

8    happened at trial"; and appellate counsel's repeated requests to "excuse her delay in responding"

9    to his ongoing letters.  (*See generally* Doc. No. 19).

10          Generally, attorney negligence is not a sufficient basis for applying equitable tolling to the

11   2244(d)(1) limitation period.  *See Holland v. Florida*, 560 U.S. 631, 651-52 (2010); *Spitsyn v.*

12   *Moore*, 345 F.3d 796, 800 (9th Cir. 2003) ("ordinary attorney negligence will not justify equitable

13   tolling").  More notably in this case, while Petitioner claims he has "shown due diligence" by

14   "continuing to pursue his claim," he fails to cite any "extraordinary circumstance," much less any

15   specific allegation of ineffective assistance of appellate counsel, that caused his failure to timely

16   file his petition.  (*See generally* Doc. No. 19); *see Smith*, 953 F.3d at 591 ("if an extraordinary

17   circumstance is not the cause of a litigant's untimely filing, then there is nothing for equity to

18   address").  Rather, the correspondence that Petitioner summarizes, presumably as the factual

19   predicate for his ineffective assistance of counsel claim, took place between 2014 and 2016, prior

20   to the relevant time period of July 20, 2016—the day the statute of limitations began to run and

21   March 2, 2020—the day Petitioner signed and constructively filed his federal petition.  Thus,

22   Petitioner has not demonstrated how his counsel's alleged ineffectiveness prevented him from

23   timely filing his Petition; nor does he make a showing of diligence during the relevant time

24   period, as required for the granting of equitable tolling.  *See Smith*, 953 F.3d at 599.

25          The undersigned finds Petitioner fails to carry his burden of demonstrating extraordinary

26   circumstances that caused the untimely filing of his Petition.  Consequently, the undersigned

27   recommends that Petitioner be denied equitable tolling and his petition be dismissed as untimely.

28   ////

### 4. Actual Innocence

"Actual innocence, if proved, serves as a gateway through which a prisoner may pass" where he has failed to meet AEDPA's statute of limitations. *McQuiggin v. Perkins*, 569 U.S. 383 (2013); *see also Lee v. Lampert*, 653 F.3d 929, 932 (9th Cir. 2011) (en banc).  Under the "actual innocence gateway" of *Schlup*, a petitioner's procedurally barred claim may be considered on the merits if his claim of actual innocence is sufficient to implicate a fundamental miscarriage of justice.  *See Schlup v. Delo*, 513 U.S. 298 (1995); *Majoy v. Roe*, 296 F.3d 770, 775-76 (9th Cir. 2002); *Carriger v. Stewart*, 132 F.3d 463, 477 (9th Cir.1997) (en banc).  If petitioner presents "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316.

"[A] petitioner does not meet the [actual innocence] threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id*. at 329.  "[H]abeas corpus petitions that advance a substantial claim of actual innocence are extremely rare." *Id*. at 321.  However, "[a] petitioner need not show that he is 'actually innocent' of the crime he was convicted of committing; instead, he must show that 'a court cannot have confidence in the outcome of the trial.'" *Majoy*, 296 F.3d at 776 (quoting *Schlup*, 513 U.S. at 316 and *Carriger*, 132 F.3d at 478).

In analyzing this innocence claim, the federal habeas court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks and citation omitted).  "Based on this total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *Id*. (quoting *Schlup*, 513 U.S. at 329).  This "new evidence" must only be newly presented, not newly available. *Griffin v. Johnson*, 350 F.3d 956, 963 (9th Cir. 2003) (finding that medical records made before the start of trial, but not presented at trial, were "new evidence" in support of petitioner's actual innocence claim); *but see Chestang v. Sisto*, 522

13

1  F. App'x 389, 391 (9th Cir. 2013) (newly acquired witness declaration not sufficiently "new" to

2  support actual innocence claim because contents were within defendant's knowledge at time of

3  trial and no explanation was given for not introducing it sooner).

### a.  Trial Evidence

5  In order to put the "new" evidence offered by Petitioner in support of his actual innocence

6  argument in context, the undersigned includes the following summary of relevant trial evidence

7  found in the February 4, 2016 California Court of Appeals opinion affirming the judgment of the

8  trial court:[8]

> During the afternoon of April 27, 2012, in Lemoore, Andrew Otto was driving home in his turquoise Mustang after running errands, when he noticed that a black sports utility vehicle (SUV), possibly an Expedition, was following him. The SUV had two occupants. Otto could not identify the driver but recognized the passenger as Castaneda, whom he knew very well.

> Otto wanted to confirm that the SUV was following him, so he pulled into the parking lot of an auto parts store. The SUV pulled in behind him. Not wanting to have the SUV follow him home, Otto then drove to a liquor store. He got out of his car and went into the liquor store. He bought two bottles of water and a lottery scratcher. When Otto came out of the liquor store, he saw the black SUV parked in the store's lot. Otto got into his car and drove off. The black SUV continued to follow him.

> Otto drove to his apartment complex and parked his car alongside the curb. The black SUV cruised slowly by, to the right of Otto's car, and then stopped. Otto walked along the sidewalk towards the SUV. Shrugging his shoulders and raising his hands with his palms open, he asked, "What's up?" Castaneda got out of the SUV on the passenger side, went around to the back of the SUV, pulled out a gun, and fired two shots at Otto. Otto took off running as a bullet grazed his arm; he heard another shot as he ran.

> Officer Mark Pescatore, who was dispatched to the scene, viewed video recordings from the apartment complex's video surveillance system. The entire series of events that unfolded in front of the complex was captured on video, which showed Otto pulling up in his Mustang, followed by the black SUV; Otto walking over to the black SUV; a passenger exiting the SUV and two muzzle flashes emanating from the passenger's position behind the SUV; and Otto

---

[8] On federal habeas review, "a determination of a factual issue made by a State court shall be presumed to be correct" unless rebutted by the petitioner by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Schriro v. Landrigan*, 127 S. Ct. 1933, 1939-40 (2007) ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.' ") (citing Section 2254(e)(1)).

running away. Pescatore also detected what he termed as "bullet splash" on an exterior building wall behind the spot where Otto was standing at the time. The officer explained that "bullet splash" refers to localized damage to stucco at the point of impact of a bullet. In addition, Pescatore obtained video recordings from the video surveillance system of the liquor store where Otto had stopped; the video showed Otto leaving the store's parking lot followed by the black SUV.

Otto, who was 32 years old at the time of trial, testified that he had known Castaneda since the sixth grade; in fact, Castaneda used to be one of his best friends. Otto and Castaneda were members of the Brown Pride Norteños, a subset of the Norteño gang in the Lemoore area. Otto had been affiliated with the Brown Pride Norteños since he was 10 or 11 years old, and had vouched for Castaneda when the latter sought to join the gang. However, Otto and Castaneda grew apart in 2003, after Castaneda slept with the mother of Otto's children.

Also in 2003, Otto dropped out of the Norteños following 15 years of active participation in the gang and gang-related criminal activities. He dropped out in part because he completed a prison drug rehabilitation program with members of a rival gang. According to Otto, the Norteños deemed members who participated in prison programs with members of rival gangs to be "no good" and "[n]ot in good standing" within the gang. He also testified that the Norteños viewed dropouts as traitors. Indeed, Norteño members would attack dropouts so as to gain increased prestige within the gang.

Officer John Paul Henderson of the Hanford Police Department testified for the prosecution as an expert witness on criminal street gangs in Kings County. Henderson opined that Castaneda was a member of the Brown Pride Norteños, an aggressive and violent Norteño subset based in Lemoore. Henderson testified that Norteño affiliates engaged in robberies, drug sales, deadly weapon assaults, drive-by shootings, and murders. He also believed Otto was a Norteño dropout based on the fact that the California Department of Corrections had classified him as such and had placed him in the "sensitive needs yard" during his prison commitments. He explained that "dropouts [are] no longer welcomed in their gang" and would be killed in prison if not segregated into "sensitive needs yards."

Henderson testified about various aspects of Norteño culture. He stated the Norteño gang is governed by a set of rules known as the "14 bonds." The gang retaliates against members who break the bonds. Such retaliation ranges from assault to murder, but ultimately depends on "political" considerations such as the status of the offending gang member, with higher-status members suffering fewer consequences. Dropping out of the gang is a violation of the bonds and dropouts are considered enemies of the gang. Consequently, the gang authorizes its rank-and-file members to attack dropouts without obtaining advance permission from the gang's command structure as is required for other crimes

15

committed on behalf of the gang.

Henderson explained that a gang member who shoots or kills a dropout gains respect and status in the gang. Gang members commit attacks on dropouts, members of rival gangs, and law enforcement personnel to advance themselves within the gang hierarchy: "Rival gangs, dropouts, and cops are three of the top things that are going to get [a gang member] the most respect and status within [the] gang. So if you get any one of those three, you could be a nobody, who can turn into a guy who may be calling shots within a certain time." Henderson believed that in attacking Otto, Castaneda was enforcing the bonds. More specifically, he explained, "when you become a gang member, you're told the rules and you're told you will assault dropouts … and he's just following the rules and being a good soldier."

On the day of the shooting, Otto was wearing black clothes, including a black T-shirt with the words, "Step your game up, get on my level." Henderson testified that while a dropout dressed in red clothing would draw the gang's attention because red is the color associated with Norteños historically, a dropout's choice of black clothing would not be particularly significant for the gang despite the fact that gang members sometimes wear black and white clothing to "throw law enforcement off." As for the words on Otto's shirt, Henderson testified that in his experience with gang members, he had "never seen that shirt or that wording," but he did not rule out the possibility that the words "could" have a gang-related meaning if the wearer was involved in a gang. Finally, Henderson agreed that Otto's words, "[w]hat's up," coupled with his open-palmed gesture, "could," depending on the context, be interpreted as an aggressive gesture.

Castaneda did not testify, nor did the defense call any other witnesses.

(Doc. No. 26-1 at 3-6). Of particular relevance in the analysis of Petitioner's actual innocence claim, the Court notes that Otto also testified during the trial that he talked to four different law enforcement officers the night of the shooting. (Doc. No. 32 at 109). He testified he was forthcoming with the officers within minutes of speaking to them, and stated he did not reveal the identity of the shooter right away because he was in shock, angry, and wanted to "go take care of it himself." (*Id*. at 109-12). He also feared for his family and attempted to avoid coming to trial, but chose to cooperate because "it's the right thing to do." (*Id*. at 113). Otto also testified that he assaulted Petitioner ten years earlier when he found out Petitioner slept with Otto's wife, but then let the incident go; and he "protected" Petitioner when Petitioner was investigated by the Norteño gang for sleeping with Otto's wife. (*Id*. at 100-05).

1    Officer Alvaro Santos testified that Otto was scared, out of breath like he had been

2   running, and was upset when he first encountered him; and Otto provided him with limited

3   information and explained that although Otto told him he knew the identity of the shooter, he

4   would not reveal it at the time.  (*Id*. at 54, 58-59).  Officer John Paul Henderson testified that Otto

5   told him when he first spoke to him at the scene of the shooting that Petitioner shot him, and that

6   Otto was concerned with speaking to law enforcement for fear his family would be harmed.  (*Id*.

7   at 301).  Officer Henderson was also informed by another officer at the scene that Otto told him

8   Petitioner "always had a grudge against me since" he slept with Otto's wife.  (*Id*. at 298, 306).

9                                **b.  Analysis**

10    In order to successfully pass through the actual innocence "gateway," a petitioner must

11   support his allegation of constitutional error with new reliable evidence that was not presented at

12   trial which can consist of "exculpatory scientific evidence, trustworthy eyewitness accounts, or

13   critical physical evidence."  *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  While affidavits may be

14   submitted and considered new evidence, they must be met with skepticism.  *See, e.g., Herrera v.*

15   *Collins*, 506 U.S. 390, 423 (1993) (affidavits made years after trial—purporting to exculpate a

16   convicted prisoner by offering a new version of events—are "not uncommon" and "are to be

17   treated with a fair degree of skepticism" insofar as they are "obtained without the benefit of cross-

18   examination").  Here, Petitioner presents nine declarations, including his own, as "newly

19   discovered evidence [that] would have probably changed the outcome of the trial."  (Doc. No. 1 at

20   4).

21    First, Petitioner himself submitted two unnotarized declarations. (Doc. No. 1 at 25-28).

22   In his October 10, 2017 declaration, Petitioner states his sister, Roseann Castaneda, reported to

23   him that "she had discovered that [] Otto had made statements contradicting his trial testimony –

24   specifically with respect to the identification of [Petitioner] as the shooter"; and after receiving

25   advice from another prisoner, Petitioner asked his sister to obtain declarations from other

26   "witnesses" also reporting that Otto did not know who shot him, and named Petitioner as the

27   shooter for a variety of reasons, as discussed below.  (Doc. No. 1 at 25).  In an additional

28   February 13 declaration, of unknown year, Petitioner submits that his trial attorney failed to

                                17

present witnesses in his defense that would testify consistent with several of the declarations discussed below, mainly that Petitioner was at Mr. Bustamante's apartment at the time of the shooting.[9]  (Doc. No. 1 at 27).  Petitioner's own declaration fails to constitute new reliable evidence for his claims of actual innocence.  *Schlup*, 513 U.S. at 324.  "A self-serving declaration is not the kind of evidence that meets the *Schlup* 'more than likely that no reasonable jury would have convicted him' standard."  *Jackson v. Beard*, 2014 WL 2657536, at *7 (S.D. Cal. June 12, 2014) (citing *Herrera*, 506 U.S. 390, 423 (1993); *Baran v. Hill*, 2010 WL 466153, at *7 (D. Or. Feb. 9, 2010); *McArdle v. Sniff*, No. EDCV 08-552 PSG (JC), 2009 WL 1097324, at *5 (C.D. Cal. Apr. 20, 2009)).  As recognized by Respondent, Petitioner's attempt to corroborate his own declaration with those of his sister and acquaintances does not serve to make his self-serving declaration more reliable.  (Doc. No. 29 at 11 (citing *Porter v. Adams*, 2007 WL 2703195, at *9 (E.D. Cal. Sept. 14, 2007) ("The court finds the declarations offered by petitioner to be rather low in terms of reliability, both because of their tardy presentation and because the declarants, consisting of petitioner and his family members, are hardly disinterested witnesses.").

Second, Petitioner offers the following declarations from Natasha Gonzalez, Regina Escandon, Lydia Alarcon, and Roseann Castaneda.

- Ms. Castaneda, Petitioner's sister, submitted an unnotarized declaration on September 15, 2017.  (Doc. No. 1 at 12-14).  She declared that she ran into Ms. Escandon in June 2017, and Ms. Escandon told her that Otto told her that he "really didn't know who shot him" and "actually didn't see the shooter," but he named Petitioner after being pressured by law enforcement to name someone.  (*Id*. at 13).  Ms. Escandon told Ms. Castaneda that she was scared to come forward earlier, and she was sorry for not "saying anything long ago."  (*Id*. at 14).

---

[9] Petitioner also states trial counsel failed to "investigate" and present evidence that he was on the phone with the mother of his child and texting another friend at the time of the shooting; and contends based on "personal inquiries and visual inspection" by family members, that surveillance video footage was not properly investigated/obtained by trial and appellate counsel.  (Doc. No. 1 at 27-28).  However, the argument advanced in the Petition as to why Petitioner is actually innocent is based solely on the theory that the victim did not know who shot him, and he falsely identified Petitioner because he was angry Petitioner slept with the mother of his children.  (See Doc. No. 1 at 4-6).

- Ms. Escandon submitted a notarized declaration on June 30, 2017. (*Id*. at 19-20). She declared that she spoke with Otto in May 2012. (*Id*. at 19). He talked about wanting to stop using methamphetamine and that he was recently shot. (*Id*.). Ms. Escandon reports that Otto told her he "was not sure" who shot him because a sports utility vehicle was blocking his view, but he "thought" it was Petitioner, and Petitioner did not like him because of the mother of Otto's child. (*Id*.).

- Ms. Gonzalez submitted an unnotarized declaration on August 28, 2017. (*Id*. at 16-17). She declared that she spoke with Otto in April 2012, the day after he was shot, and he told her that he was not sure who shot him because he had been "up for three straight days" under the influence of methamphetamine, and he did not tell law enforcement of his uncertainty in identifying Petitioner because of his "hatred" toward Petitioner because he slept with the mother of his child. (*Id*. at 16). She agreed to submit a declaration after running into Ms. Escandon in 2017, and was hesitant to come forward because she did not know if Otto was lying and she was afraid of him. (*Id*.).

- Ms. Alarcon submitted an unnotarized declaration on September 1, 2017. She declared that she read the declaration of Ms. Escandon and found it to be accurate, as she was present during Ms. Escandon's conversation with Otto. (*Id*. at 23). Ms. Alarcon also stated that she remembered the conversation because of "how cruel it was to hear that he wrongly accused a man of shooting him knowing he wasn't for sure" and "what bothered [her] most about that conversation was the fact that [Otto] told [Ms. Escandon] that the guys he accused of shooting him had it coming anyway, because of the unfinished business he had with him in the first place." (*Id*.).

As an initial matter, the declaration of Petitioner's sister, Ms. Castaneda, is subject to attack based on the inherent bias of a family member. *See Jones v. Taylor*, 763 F.3d 1242, 1249 (9th Cir. 2014)(testimony from family is less probative than testimony from disinterested witnesses); *Perez v. Foulk*, 2015 WL 9487919, at *15 (C.D. Cal. Aug. 5, 2015); *Morgan v. Martels*, 2009 WL 2591265, at *6 (E.D. Cal. Aug. 21, 2009)("It has been routinely recognized that family members are considered to be inherently biased."). Moreover, as noted by

19

Respondent, all of the declarations are from acquaintances of Petitioner's sister, or each other; and all of the declarations were obtained around the same time in 2017, "when the women allegedly ran into each other on separate occasions by happenstance and discussed what [Otto] had told Ms. Gonzalez, Ms. Escandon and Ms. Alcaron separately, approximately five years of each other," all of which renders the reliability of their accounts questionable.  *See Jones*, 763 F.3d at 1249 (fact that all three witnesses attesting to innocence came forward around the same time period years after the trial undercut witnesses' reliability); *see also Herrera*, 506 U.S. at 417 (affidavits were given over eight years after petitioner's trial and "no satisfactory explanation has been given as to why the affiants waited . . . to make their statements").  The Court also notes that the declarations are not entirely consistent with each other, nor do they consistently support Petitioner's argument that the victim falsely accused him of shooting him specifically in retaliation for sleeping with the mother of Otto's child.  For instance, Ms. Castaneda declared that Ms. Escandon told her Otto said he named Petitioner as the shooter because he was pressured by law enforcement to say something, but Ms. Escandon stated that Otto told her he named Petitioner as the shooter because Petitioner did not like him because of his relationship with the mother of Otto's children.  Finally, as noted by Respondent, the declarants do not provide eyewitness accounts of the shooting, only that they were told by Otto that he was unsure of who shot him and named Petitioner for disparate reasons.  (Doc. No. 29 at 12).

Third, while not discussed with specificity in the Petition as support for his actual innocence claim, Petitioner includes several other declarations "supporting Petitioner's alibi" from Simon Melendrez, Ignacio Sanchez, Jr., Jesus Bustamante, and Rosemarie Domingo Morgan.  (Doc No. 1 at 30-36).  All of the declarations state that Petitioner was at a barbeque on April 27, 2012, the day of the shooting, from 4:30 or 5:00 to anywhere between 7:00 to 8:00 pm.  (*Id*.).  Petitioner claims in his own declaration that he asked his trial attorney to call several of these individuals as witnesses in his defense to testify as to his whereabouts "around the time of the alleged crimes," but his attorney declined to do so because they were gang members and would be discredited.  (*Id*. at 27).

Respondent argues that this is not "new" evidence for the purposes of an actual innocence

20

1   analysis, because Petitioner was aware of the evidence prior to trial.  (Doc. No. 29 at 11).

2   However, it is well-established in the Ninth Circuit that "new reliable evidence" under *Schlup*

3   requires only "newly presented evidence," defined as evidence that was not presented at trial, as

4   opposed to "newly discovered evidence."  *Griffin*, 350 F.3d 962-63.  Here, this "alibi" testimony

5   was not presented at trial, it was not discussed at trial, and Petitioner offered a reason that the

6   evidence was not introduced; thus, arguably under Ninth Circuit law it qualifies as "newly

7   presented" evidence for the Court to consider under the *Schlup* standard.  *Cf. Machuca v.*

8   *Robertson*, 2018 WL 5270493, at *12-13 (C.D. Cal. Aug. 29, 2018) (evidence was not new even

9   though it was not presented at trial, because it was known and discussed at trial); *Norton v.*

10  *Arnold*, 2016 WL 1158590, at *11 (C.D. Cal. Feb. 12, 2016) (evidence was not new as it was

11  available to defense counsel at trial and the trial court was aware of the evidence); *Chestang*, 522

12  F. App'x at 391 (newly acquired witness declaration not sufficiently "new" to support actual

13  innocence claim because contents were within defendant's knowledge at time of trial and no

14  explanation was given for not introducing it sooner).  That said, as correctly noted by

15  Respondent, these declarations are from gang members, and those affiliated with gang members,

16  which casts significant doubt on their credibility.  *See Schlup*, 513 U.S. at 332 (when deciding an

17  actual-innocence claim, the "likely credibility of the affiants bear on the probable reliability of

18  that evidence).  In addition, the accounts offered in the declarations are not fully consistent with

19  each other.  Each declarant identifies a slightly different window of time during which Petitioner

20  allegedly attended the barbeque; and the declarants disagree as to whether Petitioner left the

21  barbeque to meet his "baby momma" or to meet his sister.  (Doc. No. 29 at 11 (citing Doc. No. 1

22  at 30-36)).  Finally, as discussed above, declarations of Petitioner's friends and acquaintances are

23  less reliable to the extent they would be considered a close relationship.  *See House*, 547 U.S. at

24  552 (noting that testimony by friends or relations of the accused might have less probative value

25  than testimony from disinterested witnesses).

26      Based on the foregoing, the Court finds that Petitioner has failed to meet his burden of

27  showing that in light of all the evidence, including "new" evidence not introduced at trial, it is

28  more likely than not that no reasonable juror would have convicted him.  *Schlup*, 513 U.S. at 327.

As argued by Respondent, there was ample evidence to support the verdict that Petitioner is guilty of the charged crimes, including consistent accounts of the shooting from the victim, corroboration with separate video footage, and testimony from experts and the victim that he was putting himself and his family at risk by testifying that Petitioner had shot him.  (Doc. No. 29 at 13-14).  Moreover, as noted by the state superior court in denying the merits of Petitioner's actual innocence claim on state habeas review,[10]

> in an effort to undermine Mr. Otto's testimony, Defense counsel attempted during trial to impugn his credibility by arguing that (1) Mr. Otto named Petitioner as his shooter due to a grudge against the same; (2) The grudge existed because Petitioner had an affair with Mr. Otto's 'baby mama' []; (3) Mr. Otto had substantial active gang ties; and (4) Mr. Otto had demonstrated significant untruthfulness in connection with much of the testimony given by him during the trial.  Although the information set forth in the declarations of Roseann Castaneda, Natasha Gonzalez, Regina Escandon, and Lydia Alarcon would serve to further undermine the veracity of Mr. Otto's eye witness identification of Petitioner, for purposes of California Penal Code section 1475, 'new evidence' is not evidence which is 'merely cumulative, corroborative, collateral or impeaching.'

(Doc. No. 26-9 at 2).

In light of all of the evidence, the Court cannot find that had the jury also been presented with the nine declarations which Petitioner now offers, it is more likely than not that no reasonable juror would have convicted him.  Petitioner does not come forward with a credible declaration of guilt by another, nor credible declarations by an eyewitness to the shooting, nor exculpatory scientific evidence.  Instead he offers his own declaration and declarations from his and his sister's acquaintances.  Such hearsay and latter-day impeachment evidence rarely shows no reasonable juror would have believed a witness' account as testified to in court.  *Clark v.*

---

[10] Respondent generally notes the findings of the state court are entitled to a presumption of correctness. (Doc. No. 29 at 14).  Respondent is correct that on federal habeas review, "a determination of a *factual issue* made by a State court shall be presumed to be correct" unless rebutted by the petitioner by clear and convincing evidence.  28 U.S.C. § 2254(e)(1) (emphasis added).  However, the Court is constrained to note that deference to the state court decisions under § 2254(d) only applies to "any claim that was adjudicated on the merits in state court proceedings."  Here, the Court is not considering the merits of Petitioner's claim of actual innocence asserted in his Petition; rather, Petitioner has proffered his actual innocence as cause to excuse his untimely petition under the *Schlup* actual innocence gateway.  The deference to state court decision on the merits pursuant to Section 2254(d) has no application in the context of a *Schlup* claim because it pertains only to a "claim that was adjudicated on the merits" in state court.  *See Duncan v. Ryan*, 2015 WL 13735818, at *199 (D. Ariz. Aug. 7, 2015).

1    *Lewis*, 1 F. 3d 814, 824 (9th Cir. 1993).  Accordingly, the undersigned concludes Petitioner's

2    claim of actual innocence does not implicate a fundamental miscarriage of justice nor does it fall

3    within the narrow category of cases which pass through the *Schlup* actual innocence gateway.

4    *See Coleman v. Allison*, 223 F.Supp.3d 1035, 1073-74 (C.D. Cal. 2015), *aff'd sub nom*, *Coleman*

5    *v. Sherman*, 715 F. App'x 756 (9th Cir. 2018) ("In the few cases the Court has located in which

6    the *Schlup* standard was found to have been met, the "new evidence" consisted of credible new

7    evidence that the petitioner had a solid alibi for the time of the crime, numerous exonerating

8    eyewitness accounts of the crime, DNA evidence excluding the petitioner and identifying another

9    potential perpetrator, a credible confession by a likely suspect explaining that he had framed the

10    petitioner, and/or evidence contradicting the very premise of the prosecutor's case against the

11    petitioner.") (collecting cases).

12         The undersigned recommends the Petition be dismissed as untimely.

13                    **III. CERTIFICATE OF APPEALABILITY**

14         State prisoners in a habeas corpus action under § 2254 do not have an automatic right to

15    appeal a final order.  *See* 28 U.S.C. § 2253(c)(1)(A); *Miller-El v. Cockrell*, 537 U.S. 322, 335-36

16    (2003).  To appeal, a prisoner must obtain a certificate of appealability.  28 U.S.C. § 2253(c)(2);

17    *see also* R. Governing Section 2254 Cases 11 (requires a district court to issue or deny a

18    certificate of appealability when entering a final order adverse to a petitioner); Ninth Circuit Rule

19    22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).  Where, as here, the court

20    denies habeas relief on procedural grounds without reaching the merits of the underlying

21    constitutional claims, the court should issue a certificate of appealability only "if jurists of reason

22    would find it debatable whether the petition states a valid claim of the denial of a constitutional

23    right and that jurists of reason would find it debatable whether the district court was correct in its

24    procedural ruling."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "Where a plain procedural bar

25    is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist

26    could not conclude either that the district court erred in dismissing the petition or that the

27    petitioner should be allowed to proceed further."  *Id.*  Here, reasonable jurists would not find the

28    undersigned's conclusion debatable or conclude that petitioner should proceed further.  The

1   undersigned therefore recommends that a certificate of appealability not issue.

2       Accordingly, it is **RECOMMENDED**:

3       1.  Respondent's Motion to Dismiss (Doc. No. 24) be **GRANTED**.

4       2.  The Petition (Doc No. 1) be dismissed as untimely.

5       3.  Petitioner be denied a certificate of appealability.

6                                         **NOTICE TO PARTIES**

7       These findings and recommendations will be submitted to the United States district judge

8   assigned to the case, pursuant to the provisions of U.S.C. § 636(b)(1).  Within fourteen (14) days

9   after being served with these findings and recommendations, a party may file written objections

10  with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and

11  Recommendations."  Parties are advised that failure to file objections within the specified time may

12  result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014)

13  (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

14

15  Dated:   __August 24, 2022__

16                                          HELENA M. BARCH-KUCHTA

17                                          UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28